## CRANDELL v. PHILPOT CONST. CO. et al.*

### No. 4334.

Court of Appeal of Louisiana. Second Circuit.

June 15, 1932.

J. B. Nachman and Isaac Wahlder, both of Alexandria, for appellant.

Overton, Dawkins & McSween, of Alexandria, for appellees.

DREW, J.

Ernest Crandell claims compensation for the loss of an arm, at the rate of $13.65 per week, for a period of 200 weeks, beginning May 24, 1931, with 5 per cent. per annum interest on each weekly payment from due date, until paid. The Philpot Construction Company and its bondsman, the Union Indemnity Company, are made defendants.

Defendants deny liability, and allege that, at the time of the accident which caused the injury to plaintiff, he was not in the employ of the defendant, that he was only temporarily employed for one day, as a substitute for a regular employee who was temporarily indisposed, and that plaintiff was paid for his day's work and discharged several hours before the accident occurred. It further alleged that, at the time of the accident, plaintiff was not acting within the scope of his employment, and that the accident and injury did not arise out of and in the course of his employment.

The lower court rejected the demands of plaintiff, and he has appealed.

The Philpot Construction Company was under contract with the Louisiana highway commission to build a hard-surface road in Grant parish, between the settlements of Bentley and Williana. It set up its camp and made its headquarters at Bentley, a station eighteen or twenty miles from the city of Alexandria, and a distance of six to seven miles from Pollack, which is the nearest village or town.

In that part of Grant parish at the time, there was considerable feeling among the white citizens against the use of negro labor, and, in fact, negroes were not allowed to live in Pollack or near Bentley. The closest place to the work of the Philpot Construction Company that the negro labor could live was the city of Alexandria. The distance from Alexandria was so great as to make it very inconvenient, if not impracticable, for the employees to live in Alexandria and work on this job, for the reason that the work began between 5:30 and 6 o'clock in the morning and continued until 6:30 or 7 o'clock in the evening. Although there was no rule of the employer that required the employees to live at the camp, it was necessary that they do so.

The construction company leased the depot from the I. & A. Railway Company for use as an office, and also a plot of ground adjacent to it for a camp site. The employees were allowed to use the leased ground, but were required to furnish their own tents, beds, and provisions. All of the employees lived in tents on this leased property.

There were three places of business at Bentley, consisting of two general merchandise establishments and one filling station, where drinks and knickknacks could be bought, and all of the provisions and clothing necessary could have been bought at Bentley by the employees, but they could not always get their checks cashed, and the employees were paid for their labor every two weeks, and always paid by checks.

The work began on the road project about the 1st day of March, and soon thereafter some of the machinery of the construction company was destroyed by dynamite. The Louisiana highway commission then furnished several guards to be used by the construction company, to serve under the orders of Mr. Philpot, the principal owner of the construction company, who instructed the guards to protect the machinery and to look after the negro quarters. It is clear, we think, that the duty of the guards was to protect the machinery from any damage, as well as to protect the negro employees from harm. All the negro employees were working by the hour; their wages being fixed at a certain amount per hour for the number of hours they actually worked.

The guards put on by the Louisiana highway commission, without any authority from any one, ordered the negro employees to be in camp not later than 9 o'clock at night. They were privileged to go where they pleased, but, if they expected to return to the camp at night, they must be there not later than 9 o'clock. If they came later, they would not be allowed to enter. If they wished to stay out all night, it was their privilege. This order was no doubt given by the guards through fear that they might mistake one of the employees for a prowler.

The employees were conveyed from camp to their work on the road by means of a truck, furnished by defendant, and, when the day's work was over, they were taken back to camp. They were no guards with the employees either in going to or from work, or while at work, until some time after the date of the accident to plaintiff.

The above facts are shown by plaintiff in support of his contention that the negro employees were under the control and protection of the defendant construction company for twenty-four hours per day. The contention is not well founded, for the facts disclose that the negro employees were privileged to go wherever they pleased, after

finishing the day's work; the only restriction being that, if they intended to spend the night in camp, they would have to be in camp not later than 9 o'clock p. m.

These conditions existed for a period of nearly three months, and existed at the time plaintiff began work for defendant and up to the time of the accident and injury to him. On Friday night, the night before the accident, plaintiff spent the night in camp, and on Saturday morning went out to work with the other employees. He applied for his job and was hired by defendant's foreman as a "puddler," at which job he worked until quitting time, about 6:30 that afternoon. It was pay day for the other employees, but, under the system in effect then, defendant only paid for work up until Thursday night, each pay day holding back two days' pay; therefore plaintiff had no pay coming. He was anxious to get his money, and, on telling the foreman that he was behind with his house rent, was advanced $3, and it was charged to "advanced payroll", that is, a record was made in order that it might be taken out of the next pay roll, two weeks hence.

Plaintiff lived in Alexandria, and, not knowing that he would secure a job, failed to bring any extra clothes to the camp with him. He wanted to go into Alexandria to his home, pay his house rent, and get his clothes. He made his wants known to the foreman, who told him that some of the other employees were going in on one of defendant's trucks, and that, if he wished to go with them, the truck would remain in Alexandria until 12 o'clock that night, at which time it would pick all of them up at Bessie's Café, on Lee street, and bring them back to camp.

The truck left camp about 9 o'clock. Mr. Peyton, a mechanic in the employ of defendant, was driving the truck, and his wife went with him. Seven or eight negro employees and a negro girl, named "Bumble Bee," boarded the truck and started to Alexandria, plaintiff, for the purpose of paying his house rent and getting some clothes from his home; some of the other employees, to get their checks cashed and do a little trading; and others, including "Bumble Bee," for pleasure. When the truck had gone only about two or three miles, it ran into two horses on the highway and caused a wreck. Plaintiff was injured to such an extent that his arm had to be amputated. He received other injuries, for which he sued originally, but in this court has abandoned his claim for anything other than the loss of an arm.

Prior to the accident, plaintiff had made arrangements with one of the negro employees to sleep in his tent for a consideration of $1 per week, and with another negro employee for board, for a consideration of $5 per week.

Plaintiff contends that he was ordered by defendant's foreman and Mr. Philpot, the owner, to board the truck, go pay his rent, get his clothes, and return on the truck at 12 o'clock, in order that he might be ready for work the next morning, that he was acting under orders, and that Mr. Peyton had complete authority and control over him while on this mission. The evidence does not substantiate this contention.

Defendant's foreman, it seems, had promised some of the employees that they could have a truck to go to Alexandria that night. When Mr. Philpot, the owner and man in charge, learned that the negro employees had been given permission to use one of his trucks on this Saturday night, he protestingly gave his consent for it to be used on just this one occasion. It was against his rules for his trucks to be taken out at night by the employees, and he again so informed his foreman. He allowed it to be used on that occasion because his foreman had promised it to the employees, and he did not want to upset the plans of the employees that were based upon the promise made them by his foreman. He was unwilling to turn the truck over to a crowd of negro employees, and ordered or requested his mechanic, Mr. Peyton, to drive it. It appears that Mr. Peyton and wife had intended going to Alexandria that night anyway.

Several of the employees testified that the foreman had repeatedly told all the employees for a week or ten days prior to the night of the accident that from then on, each pay night, he was going to send them to Alexandria in a truck, in order that they might get their checks cashed, and that the truck would wait and bring them back, so that they would be on hand to work the next day, and that this promise or notice was given them due to the fact that, when they went to Alexandria on Saturday nights, they usually failed to return in time to work on Sunday morning. Mr. Philpot testified that, if any such notice was ever given by the foreman, it was done so without his authority, as his foreman knew it was against his rules to have the trucks taken out at night.

Most of the employees on the truck the night of the accident had been in the employ of defendant on the same job for nearly three months. They had managed to get their checks cashed in some way. At least one of the negro employees had a car and went back and forth to Alexandria when he pleased. It is certain that defendant had never during that time sent the employees in on a truck or in any other conveyance. It is also certain that the contract of employment with plaintiff, or the other employees, did not call for him or them to be sent to Alexandria to get his or their checks cashed, and it was not contemplated in the contract of employment.

On this particular night, they were allowed to go to Alexandria on the truck driven by Mr. Peyton for defendant, for the reason that

they had requested it. They were allowed to go for their own convenience and as an accommodation to them, and when plaintiff expressed a wish to go to Alexandria, his home, to pay house rent and get more clothes, his wish was granted, and he was told that he might go on the truck that the other employees had been given permission to go on. He did not go to perform any service for defendant, and was solely on a mission for himself, in no way connected with his employment with defendant. It was for no benefit to defendant that plaintiff wanted to go to Alexandria; it was to attend to business of a private nature, in which plaintiff alone was interested. The only interest defendant could possibly have had was in seeing that plaintiff returned in time to go to work on Sunday morning, and it was not compulsory for plaintiff to return on the truck or to return at all. If he wanted to return, it was his privilege, and he was told that the truck would be at Bessie's Café, on Lee street, to return to camp at 12 o'clock, if he cared to go back and work the next day.

The fact that plaintiff was being conveyed in his master's truck, at his own request, is not sufficient to bring him under the provisions of the Workmen's Compensation Act (Act No. 20 of 1914 as amended) of this state. His work for the day had ceased some two and one-half hours before. He had left the premises of his master, on his way to perform private duties of his own, in no way connected with his master's business, and not for the purpose of furthering his master's business in any way. He was no longer performing any service for his master. He was not performing any duty which he was employed to perform.

The contract of employment did not call for or contemplate that plaintiff be conveyed to Alexandria for the purpose of transacting private business. He was in his master's truck as a licensee, on a mission of his own. When plaintiff left the premises of defendant, he was no longer under the control of defendant or its agent; neither did defendant nor its agent have ay authority over him. He could have left the truck before reaching Alexandria. If he had arrived safely at Alexandria, he could have gone where he pleased and done what he pleased. He could have gone back in the truck if he wished, or in a private car, or not have gone back at all. Mr. Peyton had authority to take care of the truck and nothing more. He had no authority over plaintiff. The accident which caused the injury to plaintiff did not arise out of his employment or in the course of his employment.

We have carefully reviewed the cases relied upon by plaintiff as authority for a decision in plaintiff's favor in this case, and we do not think they are applicable to the facts in the case. Each compensation case must be determined upon its own peculiar facts and circumstances as shown by the evidence, and no exact formula can be laid down which will automatically solve every case. Our conclusion from the facts, as found by us in this case, is that the injury received by plaintiff in the accident is not compensable.

The judgment of the lower court is correct and is affirmed, with costs.