## IVORY v. PHILPOT CONST. CO. et al.
### No. 4362.

Court of Appeal of Louisiana.
Second Circuit.
Feb. 6, 1933.

Hakenyos, Provosty & Staples, of Alexandria, for appellant.

R. W. Oglesby, of Winnfield, for appellees.

DREW, J.

This suit was instituted under the Workmen's Compensation Act of Louisiana (Act No. 20 of 1914, as amended), and plaintiff prays that he be awarded compensation in the sum of 65 per cent. of his weekly wage for a period of two hundred weeks, for the loss of an arm.

The defense is that the accident in which plaintiff was injured did not arise in the course of plaintiff's employment or out of his employment, but that it occurred about 10 o'clock at night, after plaintiff had ceased work for the day and had retired for the night in a tent owned by plaintiff, and that he was not at the time engaged in any service connected with his employment.

Defendants also filed an exception of no cause of action, but the record does not disclose that it was passed upon below.

The judgment of the lower court was in favor of defendants, and there has been no answer to the appeal. Therefore the exception is not before us.

The Philpot Construction Company was under contract to build a hard-surface road in Grant parish, La. In the section of the parish where the road was to be built negroes were not allowed. When Philpot Construction Company, hereafter spoken of as defendant, moved on to the job, it brought a great many negro laborers it had worked at other places. Soon thereafter, and possibly several months prior to August 16, 1931, some one dynamited the machinery of defendant, after which the state highway commission furnished to defendant a number of guards to watch the machinery and the negro laborers at night.

Defendant set up its camp at Bentley, Grant parish, La., a community where negroes were not allowed, and there was no place nearer than Alexandria where a negro could stay. This was a distance of nearly twenty miles. In order to provide a place for the negro laborers, the defendant secured a plot of ground from the L. & A. Railway Company and erected tents for the negro laborers. The tents were charged to them and a certain amount deducted each week for them from their pay until the tents were paid for. Guards were placed around the camp at night to watch for any prowlers and to protect the negro laborers from harm. The guards were furnished by the Louisiana highway department—twelve in number—but acted under instructions of Mr. Philpot, of the defendant company.

The record shows that, after the machinery was dynamited, the negro laborers would not stay on the job until they were promised by Mr. Philpot that guards would be kept there to protect them. The negroes were under strict orders not to leave camp after 10 o'clock at night.

Work on this project began in the morning often as early as 4:30 and often lasted until 6:30 and 7 o'clock in the afternoon, and for the laborers such as plaintiff to be on the job to go to work on time it was necessary that they occupy a tent located on the ground secured by defendant from the L. & A. Railway Company.

The machinery was blown up in March, and in May following an employee by the name of Crandell was injured while going to Alexandria. He sued for compensation, and in that case, under evidence very similar to the evidence in this case, this court found the following:

"In that part of Grant Parish at the time, there was considerable feeling among the white citizens against the use of negro labor, and, in fact, negroes were not allowed to live in Pollack or near Bentley. The closest place to the work of the Philpot Construction Company that the negro labor could live was the city of Alexandria. The distance from Alexandria was so great as to make it very inconvenient, if not impracticable, for the employees to live in Alexandria and work on this job, for the reason that the work began between 5:30 and 6 o'clock in the morning and continued until 6:30 or 7 o'clock in the evening. Although there was no rule of the employer that required the employees to live at the camp, it was necessary that they do so.

"The construction company leased the depot from the L. & A. Railway Company for use as an office, and also a plot of ground adjacent to it for a camp site. The employees were allowed to use the leased ground, but were required to furnish their own tents, beds, and provisions. All of the employees lived in tents on this leased property.

"There were three places of business at Bentley, consisting of two general merchandise establishments and one filling station, where drinks and knickknacks could be bought, and all of the provisions and clothing necessary could have been bought at Bentley by the employees, but they could not always get their checks cashed, and the employees were paid for their labor every two weeks, and always paid by checks.

"The work began on the road project about the 1st day of March, and soon thereafter some of the machinery of the construction company was destroyed by dynamite. The Louisiana highway commission then furnished several guards to be used by the construction company, to serve under the orders of Mr. Philpot, the principal owner of the construction company, who instructed the guards to protect the machinery and to look after

the negro quarters. It is clear, we think, that the duty of the guards was to protect the machinery from any damage, as well as to protect the negro employees from harm. All the negro employees were working by the hour; their wages being fixed at a certain amount per hour for the number of hours they actually worked." (Crandell v. Philpot Const. Co. [La. App.] 142 So. 313, 314.)

The accident sued on here occurred in August following, and we find the same conditions existed as did in May. It is therefore clear that, in order for plaintiff to work on this job, he was forced to live in a tent on the premises, and also that defendant was protecting him from harm in order that he might have his services.

While this condition prevailed, on August 16, 1931, about 10 o'clock at night, when plaintiff was asleep in his tent, some one passed and fired into the tents, killing one negro and striking plaintiff in the arm. No one, so far as the record shows, knows who fired the shots, but it is evident that they were not fired at any particular individual, as a number of shots were fired and into a number of different tents. The shots were fired from a passing truck. The guard nearest plaintiff's tent made no effort to return the fire, and remained seated in his chair. There was likewise no positive proof as to who dynamited the machinery. Some white men were arrested but finally acquitted. However, the circumstances are strong when we consider the feeling of the white people towards the negroes in that section, which was known to the defendant, and was the reason for the guards to protect them. They were under guard for no other reason than to be protected from the white people of that community who objected to their working on this project in their community where they did not allow a negro to stay. This is further shown by the fact that immediately after the shooting all negro laborers left and defendant finished the job with white men of that community.

█ Plaintiff lived in the quarters furnished by defendant, although pay for his tent was deducted out of his wages, and it was necessary that he live there to maintain his employment. The quarters were under the supervision and control of the defendant, and plaintiff's living in the tent on the premises of defendant was incidental to his employment, if not impliedly in the terms of his employment. When he was injured while asleep in his tent, he was injured in the course of his employment, and the accident and injury arose out of his employment. He was more exposed to danger than others living in that community, and was so exposed due to his employment.

Plaintiff was receiving 30 cents per hour, ten hours per day, six days a week, or $18 per week. There is no dispute as to the condition of his arm, which is 25 per cent. total permanent disability. Therefore he is entitled to 25 per cent. of 65 per cent. of $18 per week for a period of two hundred weeks. He spent $75 for doctors' and medical bills, which he is entitled to recover.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be reversed and there be judgment in favor of plaintiff and against defendants, Philpot Construction Company and Union Indemnity Company, in solido in the sum of $75, and in the further sum of 25 per cent. of 65 per cent. of $18 per week for a period of two hundred weeks beginning August 16, 1931, with 5 per cent. per annum interest thereon from due date until paid, and for all costs.