## LOGNION v. LAKE CHARLES STEVE-DORES, Inc., et al. *
## No. 1676.

Court of Appeal of Louisiana. First Circuit.

Feb. 12, 1937.

A. Sidney Burns, of Lake Charles, for appellant.

McCoy, King & Jones, of Lake Charles, for appellees.

LeBLANC, Judge.

This is a suit brought under the workmen's compensation statute (Act No. 20 of 1914, as amended), in which the plaintiff, George Lognion, who was accidently shot by the discharge of a rifle which he held in his hands, lost the use of his right eye, and seeks to recover compensation from his alleged employer, Lake Charles Stevedores, Inc., and its insurance carrier, United States Fidelity & Guaranty Company, in the sum of $2,000 payable weekly in installments of $20, beginning November 12, 1935, and the further sum of $250 for medical and other expenses incidental to the treatment of his injury.

Plaintiff alleges in his petition, that the defendant Lake Charles Stevedores, Inc., his employer at the time of the accident, was engaged in the business of loading and unloading cargoes of vessels at the docks in the city of Lake Charles, in the parish of Calcasieu, which business is of a hazardous nature and one contemplated under the employer's liability law of this state. He alleges further that on November 12, 1935 (the day on which he sustained the injury on which his claim is based) and for some time prior thereto, he was employed as a laborer to carry on his employer's business, as aforesaid, and was paid for his work at a certain stipulated rate per day. The petition then goes on to recite that on November 12, 1935, he reported for work at the office of his employer, at its request, and that of its subcontractor and agent, at approximately 8 o'clock in the morning, and, while awaiting the arrival of a ship to be unloaded, he was instructed to procure guns and ammunition, to prepare the same for use and store them in defendant's office on the

*Rehearing denied March 5, 1937. Writ of error refused March 29, 1937.

premises occupied by it on the docks. The purpose of having these guns, it appears from the petition, was because there were labor troubles going on at the docks due to a strike, all of which had brought on several gun battles, and that because of those conditions, the work was being carried on under constant fear of further hostilities.

Plaintiff alleges further that after having carried out the instructions given him to procure the guns and store them, and while attempting to load them, a cartridge in one of the rifles accidentally exploded while he was trying to remove it and a portion of the metal struck his right eye and completely and permanently destroyed his sight through it.

The defense, as appears from the joint answer filed in behalf of both defendants, is a denial that the plaintiff was employed by the Lake Charles Stevedores, Inc., on November 12, 1935, the day on which he was injured, and whilst it is admitted that he suffered an accident on that day, it is denied that at the time, he was under the employ of the defendant Lake Charles Stevedores, Inc., or was engaged under its instructions in handling firearms or that he was doing so with its knowledge or approval. As a consequence, it is denied, of course, that he was injured while in the scope or during the course of any employment by that defendant.

From a judgment below rejecting the demands of the plaintiff, this appeal was taken by him.

Briefly outlined, the manner in which a stevedore obtains his labor for the purpose of carrying on his work is as follows: After securing his contract to load or unload a ship, he ascertains as near as possible, the date and hour of its arrival. As he has to depend on longshoremen for his labor, and this labor is all organized, he contacts the business agent of the particular association he deals with, and gives him notice that he will require so many crews. The business agent then gets in touch with the gang foreman, and these in turn order the men to report at the docks at a given hour, prepared to go to work.

The plaintiff in this case belonged to the local unit of the Louisiana Longshoremen's Association in Lake Charles. There was another association operating in that city, known as the International Longshoreman's Association. For the sake of brevity, in this opinion, the latter will be referred to as the I. L. A. and the former as the L. L. A.

As appears from the pleadings and facts adduced in this case, there had been serious labor troubles at the docks, brought on by the rivalry between the two associations, the same culminating in riots which resulted in the killing and wounding of several persons.

Because of the existing conditions, work was practically tied up, and from the latter part of October, 1935, to the middle of November, there had been no work done at all. In November, the defendant herein Lake Charles Stevedores, Inc., had petitioned the federal District Court for the Western District of Louisiana, for an injunction against the I. L. A., asking that court for an order restraining that organization from interfering with its operations "in loading and unloading vessels at the docks." The court issued a rule nisi, against the I. L. A., ordering it to show cause why the injunction should not issue, and made the same returnable on November 12, 1935, which is the day plaintiff was injured.

Under the plan of work outlined, it should be stated further, that under the rules governing the association, the men called to work are entitled to be paid for a two hours' stand-by. That is, if they report for work and are required to stand by two hours before actually beginning work, the stevedore has to pay them at the agreed wages for that time.

Plaintiff claims that he received a call to go to work on the morning of November 12, 1935, and reported at the docks, at the building where the Lake Charles Stevedores, Inc., maintained its offices. His testimony as to who particularly gave the order is rather confusing, this being due, no doubt, to his desire to implicate some one connected with the Lake Charles Stevedores, Inc., in the call for work. He starts out by stating that the order was given by Harry Harrison, who is shown to have been the president and business agent of the L. L. A., and yet, in another part of his testimony appears the statement that "on this particular thing I was going to work on, it was on Mr. Austin's call." There are three Austins who appear to be the principal officers and who manage the affairs of the Lake Charles Stevedores, Inc. They are C. H. Austin, Sr., C. H. Austin, Jr., and Horace Austin.

We are satisfied from plaintiff's own testimony, however, as well as that of various other witnesses, that the order, if any, to report on the morning of November 12, 1935, was given by Henry Harrison and not by any of the Austins.

Granting that the order was issued by Harrison, however, the next important question which presents itself is whether Harrison had been given notice himself by any of the Austins on behalf of the Lake Charles Stevedores, Inc., and had thus become their agent. Besides the statement quoted from plaintiff's own testimony and the surmises on the part of other witnesses that the call had come in the customary manner, from which plaintiff would want it to be inferred that Harrison had received his notice from one of the Austins, there is nothing in the record to show that he did. He says that he did not, and the three Austins testify positively that they gave no orders for a call to work. Without a notice from some one connected with the Lake Charles Stevedores, Inc., Harrison had no authority to bind that defendant by simply issuing the order himself. His sole connection, as far as the record shows, was with the L. L. A., and he is in no way shown to have been the representative of the Lake Charles Stevedores, Inc.

A circumstance strongly corroborative of the defendant's proof that there had been no call made by any of their representatives upon the association for men to report for longshoremen's work on the morning of November 12, 1935, arises out of the fact, which is undisputed, that not only was there no ship due to arrive in port that day, but none was expected until November 14th. It would be unreasonable to assume that a stevedore would issue a call for labor to report for loading or unloading a vessel 48 hours before it reaches port.

When it is made to appear certain that plaintiff could not show that he had been injured as a result of an accident which occurred while he was in the discharge of a duty having any connection with the actual work of a longshoreman, an attempt is then made to show that he was at the docks that morning in answer to a call made at the request or on behalf of the Lake Charles Stevedores, Inc., to guard and protect their property, and that as he was injured while on their premises, he is entitled to recover compensation. That

is shown by plaintiff's testimony about a certain telephone conversation he says he overheard that morning when he was in the office of the Lake Charles Stevedores, Inc. That thought also most probably prompted his statement already quoted herein that "on this particular thing I was going to work on" the call had come from Mr. Austin.

In the telephone conversation plaintiff testifies about, Horace Austin is said to have told the party with whom he was speaking, "All right, I will see to getting some protection," and that he then turned around to Harry Harrison, who was also present in the office, and said to him: "Is any of the boys here that has got guns, send them after them and bring them and put them in the office and lock them up." Plaintiff says that he and Harrison then left the office and Harrison asked him if he could get those guns which he and his brother-in-law had, and when he told him that he could get part of them, he was instructed by Harrison to look up Eddie Daigle and get him to take him in his car to get the guns. His instructions were also to the effect that when he would return with the guns to drive the car to the rear of the office so that no one would see them, take the guns out, lock them in some room in the office and give the key to Mr. Horace Austin. Carrying out these instructions, plaintiff says that he got in a car with Gabriel Beough and Eddie Daigle and then drove into town to get the guns. When he returned to the office he brought them inside the office and told Austin that he did not have any cartridges. Austin then got a box of cartridges, gave them to him, told him to load them, lock them, and bring the key to him, saying, "I am responsible for those rifles." He loaded two of the rifles and placed them in a small room in the rear of the building, and was loading the third when it accidently exploded and caused his injury.

The only part of plaintiff's testimony which is corroborated by other witnesses is that with regard to the instructions given him by Harrison to go get the guns. Even to that extent, however, there appears to be some conflict among his own witnesses. Harrison denies that he gave any such instructions to the plaintiff, but conceding that he did, it is certainly not shown that he did so on any authority given him by, or at the request of any one of the representatives of the Lake Charles Steve-

dores, Inc. With regard to the alleged telephone conversation plaintiff says he heard in the defendant's office, his testimony is all that appears in the record to substantiate it. Harrison, who was present, says that he heard no such conversation, and Horace Austin positively denies that any took place.

Outside of the plaintiff's own testimony, there appears nothing to indicate that the Austins or any one else connected with the Lake Charles Stevedores, Inc., had anything to do with ordering guns or other weapons and ammunition brought to their office building. Their testimony regarding the storing of the rifles is to the effect that the room in which plaintiff was at the time of the accident was one, the key to which hung on a nail in the hall, and was accessible to anybody who cared to use it. They knew that the L. L. A. had guns stored in their building and raised no objection to it, for the reason, as we see it, that their sympathies in the labor troubles going on at the docks were with that organization. But that of itself was not sufficient to create the contractual relation of employer and employee between them and any member of that organization. Certain it is that there is nothing in the record to show that plaintiff had been hired by that defendant and was to be paid any wages for guarding and protecting their property or any interest they may have at the docks.

It is important to bear in mind that there was to be a hearing in the federal District Court that same day on the application for an injunction against the I. L. A., and, as testified by several witnesses, there was a strained and tense feeling existing due to the rivalry between the two organizations. There were, according to plaintiff's own testimony, about 150 men at the docks that morning, and from what can be gathered from the record, most of them, if not all, went there expecting trouble, depending on which way the court ruled on the injunction, and prepared to meet it if it came. Whether they assembled there as a result of concerted action on their part, or at the call of Harry Harrison, president and business agent of the L. L. A., is not made certain by the record. It does appear certain, however, that they were not there in response to a call made at the request of the defendant Lake Charles Stevedores, Inc., for the purpose of carrying on its business of loading or un-

loading a vessel as there was no ship in port and none was expected to arrive for 48 hours. Nor, in our opinion, does the record show that they were there at the call of this defendant in order to guard and protect its property. These were the burdens of proof which the plaintiff assumed and which, in our opinion, he failed to carry.

Much law has been cited to us, but, as we view the case, the only question involved is whether, from the facts as disclosed by the record, there existed between the defendant, Lake Charles Stevedores, Inc., and the plaintiff, the relation of employer and employee on which the latter's recovery for compensation is necessarily based. In Ivory v. Philpot Construction Company (La.App.) 145 So. 784, so confidently relied on by plaintiff, that relation was clearly shown to exist, and therefore the decision of the court in that case cannot serve as authority in the present.

We think that the district judge has correctly analyzed the facts as they appear from the record, and we find ourselves in accord with the conclusions reached by him. Certainly there appears no such error as to warrant a reversal of the judgment, and it is for the reasons stated, affirmed.

OTT, Judge (dissenting).

In my opinion, the plaintiff is entitled to compensation on account of the injury which he received. The Workmen's Compensation Law should be liberally construed in order to effectuate its purpose.

The testimony of C. H. Austin, Jr., the bookkeeper for defendant corporation, shows that plaintiff had worked in loading vessels on the docks November 8th, 9th, and 10th. On the 10th he had worked directly for the defendant and on the 8th and 9th he had worked for Lykes Brothers and was paid off in the office of the defendant, and this witness says that plaintiff's work on these three days was exactly the same as though he had been working for defendant. As plaintiff was in the employ of the defendant on November 10th had the relationship of employer and employee been disconnected on the 12th when plaintiff was injured in a room under the control of the defendant and adjoining its offices on the docks? I think not.

The record shows that the International Longshoremen's Association (hereafter referred to as the I. L. A.) had called a

strike at the Port of Lake Charles. One witness, Abe Knight, testified that the Austins, who were the controlling officers of the defendant corporation, had encouraged and helped finance the organization or re-organization of the rival union called the Louisiana Longshoremen's Association (hereafter referred to as the L. L. A.). The Austins deny that they or the corporation which they control had anything to do with the organization of this rival union. Even though it be conceded that they did not furnish any financial assistance as claimed by Knight, the record fully justifies the conclusion that the L. L. A. received the favor and approval of these officers of defendant corporation. Indeed, the defendant had contracted with the L. L. A. to furnish all labor required by defendant in loading and unloading vessels for it during the strike of the I. L. A. So the L. L. A. was in this respect a strike-breaking organization, with a contract to furnish defendant 'the labor which it could not otherwise procure on account of the strike of the I. L. A.

The evidence further shows beyond question that Harry Harrison at the time of plaintiff's injury was the president and business agent of the L. L. A. and that Harrison had almost complete control over calling out the men for work, in determining who would work, in making up the gangs, and, in fact, in practically directing all the work for the defendant. While Horace Austin, the general manager of defendant corporation, was supposed to issue calls for men to load the vessels which calls were to be given to Harrison, the business agent of the L. L. A., who in turn would call out the men, it appears from the record that Harrison was given almost complete charge of the work. The Austins worked hand in hand with Harrison and relied on him to see that the work was done under the contract with the L. L. A.

The men whom Harrison selected and put on the job were accepted and paid by the Austins without question. Under the arrangement by which defendant was securing men to do its work, Harrison was invested with implied authority to select the men who were to become the employees of the defendant, and when the men had been so selected and put on the job, by Harrison, they were as much the employees of defendant as though Harrison had been given express authority to go out and employ men for the defendant.

It follows from this conclusion that if plaintiff was on the premises of defendant when injured at the call of Harrison, and if plaintiff was there in the interest of defendant and in furtherance of its business, he was as much in the employ of the defendant on the 12th as he was on the 10th, having been called there on both occasions by Harrison.

The decided preponderance of the evidence is to the effect that plaintiff, as well as several other members of the L. L. A., were at the docks on the morning of the 12th at the call of Harrison. It is true that the evidence does not show that any one of the Austins issued a call to Harrison to have the men out on the 12th. But the circumstances, if not the direct evidence, show that the men were out on that day with the knowledge and approval of Horace and C. A. Austin, Jr.

Plaintiff testifies that when he reached the docks on the morning of the 12th Horace Austin told Harrison to send some of the men after some guns for protection; that Harrison then told plaintiff to look up Eddie Daigle and get some guns; that he, Daigle and another man went out in town and got three rifles which were brought in at the back of defendant's office where Horace Austin unlocked the door and later procured some cartridges for the rifles; that a few minutes later he, plaintiff, was injured in this office when attempting to load one of these rifles. Austin denies, in toto, this statement of plaintiff, but it is significant that plaintiff put these rifles in a room adjoining Austin's office, while Austin was present, the keys to this room being under the control of the defendant. Whether or not Austin sent for the rifles, as plaintiff claims, there can be no serious question but that Harrison told plaintiff to get these rifles and put them in this office. Nor can there be any serious question but that Austin knew and acquiesced in placing the guns in the office, and he doubtless knew at whose orders and for what purpose these firearms were being placed in an office under his control.

The record shows that a restraining order had been issued by the federal court against the I. L. A. at the instance of the defendant on November 7th, and the rule was to be heard on the 12th. There was considerable tension on that day for the reason that further trouble was feared should the restraining order be dissolved,

thereby leaving the pickets of the I. L. A. free to invade the docks. There existed an emergency under which it became necessary for the defendant to protect its property and its position on the docks. It is reasonable to assume that the defendant would take precautionary measures to protect its property and its workmen in case the restraining order was dissolved.

All of these circumstances tend to support the contention of the plaintiff, that he was on the premises of the defendant with the approval of the defendant and in continuation of his employment of two days previous. He had procured the guns at the request of the one with whom defendant had intrusted practically all of the responsibility of securing men and of supervising the work. Plaintiff was doing something which he was led to believe was in furtherance of the interests of his employer, and in carrying out instructions which came, as he thought, directly from his employer. It cannot be said that plaintiff was acting in his own interests in bringing firearms on the premises of his employer, and with its approval, at a time when there was much greater need for protecting the interests of the defendant than that of the plaintiff.

It is stated in the majority opinion in support of the conclusion that no call had been issued by the defendant for the men to assemble on the 12th, that there was no ship due to arrive in port until the night of the 13th or the morning of the 14th, and, accordingly, there was no occasion for the men to come out for work. But under the situation as it then existed, it was very important that the defendant be in position to hold its advantage and protect its property should the injunction be dissolved and defendant's employees, as well as its property, be subjected to an attack by the I. L. A. The situation was an unusual one, and defendant's safety was not so sure as its officers would now have it appear.

Harrison's testimony is so thoroughly contradicted that I cannot give it much weight. He denies that he called out plaintiff and the other men for the 12th, yet several men testified that such a call was given by him; he denies that he told plaintiff to get the guns, yet he is contradicted on this point, not only by plaintiff, but also by two other men who gave their testimony against defendant with great reluctance. But the most unreasonable part of his testimony is that wherein he states that he was not present on the docks on the 12th until just after plaintiff was injured. The testimony is overwhelmingly to the effect that Harrison was out on the docks before plaintiff was injured, and, as already stated, gave orders to plaintiff to get the guns and put them in the back office; and that it was one of these very guns with which plaintiff was injured. The majority opinion must assume that Harrison was present before plaintiff was injured, as Harrison's testimony is cited in corroboration of Austin's denial that he told Harrison to have the men get some guns for protection.

The statement of plaintiff to the effect that Horace Austin told Harrison in the office that morning just after a telephone conversation to have the men get some guns for protection is contradicted by Horace Austin. If Harrison was not there at the time, certainly he could not know whether plaintiff heard Austin make the statement attributed to him by plaintiff; but, I believe Harrison was in the office, even though Austin did not tell Harrison to send the men after the guns, on which question there may be room for doubt. The fact that Austin permitted, if he did not request, plaintiff to put the guns in an office under defendant's control, tends to support plaintiff's statement.

The defendant had contracted with the L. L. A. to furnish the labor for loading and unloading the vessels for which it had secured contracts as a stevedore. In a way, the defendant may be said to have subcontracted the labor to the L. L. A. Under this arrangement, the men selected by the business agent of the L. L. A. were as much the employees of the defendant as they would have been had they been in the immediate employ of the defendant. See section 6 of Act No. 20 of 1914, as amended by Act No. 85 of 1926. If plaintiff was doing something in furtherance of defendant's business when he was injured, it is immaterial whether he was employed directly by or acting under instructions from the officers of the defendant, or under instructions from the officers of the L. L. A.

In order for an employee to recover compensation, it is not necessary that the injury be received during the work period, nor is it necessary that the employee actually be receiving wages. The circumstances may be such as to require the pres-

ence of the employee on the premises while not actually engaged in his regular work. He may be required to do some act outside of his usual employment to protect his employer's property, or to make it safe and convenient for him to do the work for which he is employed. In my opinion, this is such a case arising, as it does, from an emergency. The presence of plaintiff on defendant's premises was in pursuance of his employment because of the situation as it existed, and in order for plaintiff to be able to make his employment effective. Ivory v. Philpot Const. Company (La.App.) 145 So. 784; Malky v. Kiskiminetas Valley Coal Co., 278 Pa. 552, 123 A. 505, 31 A.L.R. 1082; Holland v. Continental Casualty Company (La.App.) 155 So. 63.

I therefore respectfully dissent.