**LEDOUX et al. v. FLEMING et al.**

**No. 1674.**

Court of Appeal of Louisiana.    First Circuit.

Feb. 12, 1937.

Chas. C. Jaubert, of Lake Charles, for appellant.

McCoy, King & Jones, of Lake Charles, for appellee.

LeBLANC, Judge.

Plaintiff, Joe Ledoux, instituted this suit in his capacity as natural tutor of his minor son, Leno Ledoux, against Herman Fleming, conducting a stevedore business under the trade-name of Shipside Warehouse Company, in the city of Lake Charles; David J. Joseph Company, Inc., a Texas corporation, and the United States Fidelity & Guaranty Company, to recover compensation during a period not to exceed 400 weeks, as for total, permanent disability at the weekly rate of $20, plus $250 for medical services, for what is alleged to have been an injury suffered by his said minor son and arising out of the course and scope of his employment, as a longshoreman, by the said Herman Fleming, on July 1, 1935.

Fleming had a contract with David J. Joseph Company, Inc., to load a cargo of scrap iron aboard the Steamship Queen City. The order had been sold to a Japanese concern, Mitsubishi, Sooji, Kaisha, Limited, with headquarters in this country in New York City, and under the contract of sale the terms were at a given price per ton, FAS (free alongside ship) at any Southern port. It might be stated here that the David J. Joseph Company, Inc., was sought to be held on the theory that under the contract they had to load the scrap iron aboard ship and therefore they were concerned with the employment of plaintiff's son as a longshoreman engaged in loading the vessel, as well as was Flem-

ing, the stevedore. The contract having been shown to be otherwise, the proof being that the consignee, the Japanese concern, was to pay for the loading and that the stevedore was in fact acting as its agent, plaintiff seems to have abandoned his claim as against the David J. Joseph Company, Inc. We find no formal withdrawal of his demand against that defendant, but no mention whatever is made of it before this court and we presume it has passed out of consideration.

The United States Fidelity & Guaranty Company is sought to be held as the compensation insurance carrier of the defendant Fleming.

The defendants had denied generally all allegations contained in the plaintiff's petitions, both original and supplemental, and we had thus three issues presented; that of plaintiff's son's employment by Fleming, his alleged disability, and the rate of compensation received by him. We find now, however, that all issues have passed out of the case save that of employment vel non of plaintiff's son by the defendant Fleming, and on that issue, the district judge held that the relation of employer and employee did not exist between them. He accordingly rendered judgment dismissing plaintiff's suit whereupon this appeal was taken. Plaintiff had been granted an order to prosecute his suit in forma pauperis, hence there was no judgment for costs.

As we understand the conditions attending the loading of a vessel in port, from the facts appearing in the record, the stevedore who obtains a contract to load one, engages as his labor, the men who belong to a longshoremen's association. Under the regulations of the latter organization, the stevedore, after ascertaining as near as possible, the date or hour of arrival of the ship, contacts the business agent of the association and gives him the necessary information. Under normal conditions, the business agent through the foremen then takes charge of sending out the men to the docks in regular crews, the number of each crew varying according to the amount of work that is to be done, and the hours each shift is to work. As the associations are composed of · both white and negro labor, the work is also distributed on some sort of pro rata basis between the two races. According to the testimony of Abe Knight, former business agent of one of the associations, we understand also that the men are supposed to get paid for a two-hour stand by free. That, we understand further to mean that if they are sent out to the docks and have to stand by for two hours before they can begin working, either because the ship may have been delayed or preparations for loading have not been completed, they are entitled to pay for those two hours.

In this case, Fleming, the stevedore who had a contract to load the steamship Queen City, contacted Abe Knight, the representative of the Louisiana Longshoremen's Association in Lake Charles at that time, during the afternoon of Saturday, June 29, 1935, as he was going to use the men of that association as his labor on this job. The vessel was expected that day, but there seems to have been some uncertainty as to the hour of its arrival.

On account of an abnormal situation existing among the longshoremen's associations at the time, it becomes necessary to refer to that phase of the case in the light of the facts found in the record, in order to get a correct and definite impression about the relation that existed, either directly or impliedly, between plaintiff's son and the defandant Fleming, for the purpose of deciding the issue on which the demand for compensation rests.

There are two longshoremen's associations in Lake Charles. One, the Louisiana Longshoremen's Association (hereafter referred to as the L. L. A.) and the other, the International Longshoremen's Association (afterwards referred to as the I. L. A.). We get the impression from some of the testimony that there had been some sort of working agreement between these two associations, but lately there had been some misunderstanding which led to trouble and it is definitely shown that the I. L. A. had called a strike for July 1, 1935, which was two days after the expected arrival of the steamship Queen City. This strike naturally would involve the loading of all vessels on the Lake Charles docks.

Because of the tenseness of the situation existing on Saturday June 29th, when Fleming notified the agent of the L. L. A. of the expected arrival of the ship Queen City, instead of rounding up a crew of men as usual to be ready to go to the docks, the agent of the association called a meeting of the whole membership for Sunday morning at 10 o'clock. On whose instructions this meeting was called is very uncertain, as far as the record shows. Knight testifies that the orders for that meeting

were given him by one Horace Austin, and Herman Fleming, but this is seriously disputed. Regardless at this moment, who gave the order, the meeting was held on Sunday morning and was attended by most of the members. At that time, the ship had not yet arrived in port and did not get in until noon of that day. However, it was decided at the meeting that every member was to report on the docks that Sunday evening at 7 o'clock and the record shows that 250 white men and an unmentioned number of negroes did report.

During Sunday night, the I. L. A. learned of the action of the L. L. A. and, claiming that they had a contract to load the steamship Queen City, called on Mr. Henry A. Reid, the sheriff of Calcasieu parish, in an effort, as we see it, to protect what rights they claimed under their contract. The sheriff, at about 4 o'clock Monday morning, called at the home of Mr. John J. Robira, the district attorney, and they together went to see Mr. Fleming with the idea of trying to avert trouble between the two associations, if that were possible. Mr. Fleming agreed to meet these gentlemen out on the docks in a few minutes. He did go, as promised, and sat in a conference with them, Mr. Austin, and Mr. Austin Nelson. The sheriff and Mr. Robira informed the others that I. L. A. claimed to have a contract to load the Queen City, which contract they said they could produce before noon of that day, and in a spirit of having some understanding so as to avoid bloodshed, they suggested that the L. L. A. hold off work until that hour and that the men be sent home awaiting further orders. This was agreed to and Mr. Reid, the sheriff, and Mr. Robira went to notify the members of the I. L. A. who in the meantime had gathered on Sallier street near the docks, and tell them that they could go home, everything having been adjusted for the time being. The I. L. A. representatives answered them that they did not like "Breaking up" at this time because they had no faith in the promises of the L. L. A. They feared that as soon as they (the I. L. A.) would leave, the others would begin loading the ship. However, we understand from the testimony of both the sheriff and Mr. Robira that they would abide by the agreement to wait until noon if the L. L. A. would withdraw their men from the docks. Mr. Reid and Mr. Robira then returned to the office on the docks where they had held their conference with Fleming, Austin,

and Nelson. At that time, it appears from the testimony of both that Fleming had already left. When they reported to the others, it was Horace Austin, whose relation or position is in no way disclosed by the record, who refused to have the men withdraw from the docks, stating, in the words of Sheriff Reid, "We have the position and the defenses and to Hell with them; we are going to hold what we have got." Reid and Mr. Robira left and it was but a short while after that the firing began and plaintiff's son who was "on the back road that goes through the woods there by the docks," according to his own testimony, received a shot in his right leg causing him the injury which he claims has rendered him disabled and entitles him to compensation from Fleming and his insurer, the United States Fidelity & Guaranty Company.

It is undisputed that Leno Ledoux had never worked on the docks before and that on the night of Sunday June 30th, when he went out with almost the entire membership of the L. L. A., it was his first experience in going on the docks in any connection with the association. He never was on Fleming's pay roll in his life and naturally on account of his injury did not take part in the loading of the ship Queen City which was not loaded until four or five days after the shooting.

From the nature of a longshoreman's employment as we have tried to outline it, we would say that had Leno Ledoux been sent out to the docks in the usual and ordinary course of that employment, and while standing by for the two hours before work actually began, had been injured in any manner as the result of an accident, he would be entitled to compensation because then the relation of employer and employee between the stevedore who had the contract to load the ship and himself, through the association, had already come into existence. We do not think, however, under the facts as shown in this case, that that relation ever existed between the plaintiff's son and the defendant Fleming.

Plaintiff depended a great deal on the testimony of Abe Knight (who it can be stated here had severed his connection with the association the morning of the trouble) to make out his case against Fleming, but we agree with the district judge that Knight appeared to be a very partisan witness and his testimony is so much contradicted in some instances as to make

any part of it hard to accept. In his direct examination he would have it appear that all orders for the whole membership to be on the docks at 7 o'clock Sunday evening were given by both Fleming and Austin, and whilst he sometimes seems to stress on the authority of Austin, he always tries to connect Fleming with him, and in fact testifies positively that Austin was interested in the Shipside Warehouse Company, and had almost as much to do with it as did Fleming. Later on there appears some doubt in his testimony as to which one had specifically given him the instructions to have all the men at that time. He admits that Fleming was not a member of the association and could not be one because of his occupation of stevedore, so it strikes us as a bit strange that he could have been giving orders as to what the members should do.

This matter about the whole membership being called out that night, in our opinion, was one of the internal management of association itself and with which no outsiders had or could have anything to do. What Fleming was interested in was in getting out a gang of men to be on the docks on Monday morning, as that is shown to be the time when he intended to start loading the ship. Certainly for the purpose of loading alone, it was not necessary for the whole membership of the association to be there as they could only work a certain number of men in each shift. If the association decided to have all the members out, either by action taken at the meeting Sunday morning, or on orders given by Austin or any one else, that, as we see it, was for the purpose of fortifying their position as the one furnishing the men to load the ship, in view of the impending trouble with the rival organization. As a matter of fact, Fleming, if his testimony is to be believed at all, was not aware until late during the night that the men were out on the docks.

The second point made by counsel for plaintiff, as we understand the theory of his case, is that the men having been instructed to go out on the docks Sunday night could assume that they were being called out to be prepared for work at any time during the night, and therefore plaintiff's son along with the others was on the premises of the employer prepared to perform his services and when injured under such circumstances is entitled to recover. That brings up again a question of fact for the decision of which in his client's favor counsel has to rely on the testimony of certain witnesses who say that they understood that they were to begin loading shortly after they arrived at the docks. But in this instance, even the witness Knight gives the impression that his instructions were to have the men out there Sunday night so as to be prepared to go to work on Monday morning, and if we need further proof that that was so, we need go no further than the testimony of plaintiff's son himself who says that the order was to be there that night to be ready to go to work the next morning. Much is said about a member being required to go out at the cost of losing his membership in the association, but we cannot understand what Fleming or any one else outside of the association had or could have to do with that. That was a matter for the association itself or its officials to determine. Such a penalty may have been stipulated, but it was not in our opinion, with the view of helping in the loading of the ship under Fleming's contract, but rather to protect the integrity of the association itself and strengthen its position against the other organization which had already called a strike for Monday morning.

Our conclusion is that Fleming, on Saturday afternoon, did nothing more than was usual and customary in giving notice that he would require the services of the association's men to load the ship and that he had no connection with all that transpired within the association itself during Sunday and Sunday night. He was not to become an employer of any man in that association until a few hours before they actually began work on the ship and least of all did he or plaintiff's son know that the latter was to become one of his employees. The latter had no right to assume that he would be assigned to work any more than did any other man in the organization. It is said that they were all sent out because they had not worked for some time and they were "green and sappy," the purpose being to give them all a chance to get work. But why the necessity of sending them all out at one time? The same result could have been accomplished by sending out one gang at a time, even conceding that each would do only three hours work or so. The real and primary purpose in sending out the whole membership on the docks that night, in our opinion, was in the interest of the union itself and had nothing to do with the employment

of any one individual to load that ship for Fleming, the work for which was not to begin until 8 o'clock the following morning.

We next come to what transpired at the docks at about 4 o'clock or a little after on Monday morning, and here again we find nothing on which to base the relationship of employment between Fleming and the plaintiff's son. If anything, the testimony on this point makes such a relationship even more remote because we do not think there is any doubt that Fleming himself was agreeable to waiting until 12 o'clock in order to settle any difference between the two organizations, if possible, as is testified to by Sheriff Reid and Mr. Robira. There is some testimony that he told the men to "stand by" until that hour, from which it is again implied that they were under his orders arising under his employment of the association to load the ship. There is conflict on this point even among plaintiff's own witnesses and he, Fleming, testifies that he visited the men in compliance with the sheriff's agreement and advised them that there would be no work until noon as the opposing organization had promised that they would produce a contract by that time showing they were entitled to do the loading. Our impression of what transpired afterwards came about because of the attitude of Horace Austin, and unless plaintiff can connect Austin as Fleming's agent or representative, which he has not done, we do not see how the latter can be held responsible either directly or impliedly for any result flowing from his actions.

We have given careful consideration to the testimony and to all the facts and circumstances arising out of the record in this case and are unable, even under the liberal construction which is to be accorded the compensation statute, to class plaintiff's son as an employee of the defendant Fleming. His recovery, as frequently stated by this court and others in this state, has to depend on some form of employment. The most that can be said of plaintiff's son is that he had some prospect, depending on certain contingencies, of working as a longshoreman, loading that vessel for the defendant. But mere prospects of work do not create the relation of employer and employee.

Whether the relation had come into existence is, in our opinion, the only issue of law involved in the case. Ivory v. Philpot Construction Co. (La.App.) 145 So. 784, cited and relied on by plaintiff has the material differences of an accident happening to an employee who was actually employed by the defendant and working for him, and being injured on the premises furnished as a lodging place by the employer. Here, as stated, the injured party at best had only prospects of employment and was injured on public property in a struggle between the association of which he was a member and a rival organization.

It is a well-recognized principle that compensation cases present no exception to the general rule that a plaintiff, in order to recover, must prove his case to a legal certainty, and that to make it probable only is not sufficient. Here, we have a case depending almost entirely on an issue of fact. On that issue, the trial judge has decided adversely to the plaintiff's contention, and has furnished us with reasons which we think support his findings. For our part, we are unable to point out manifest error which must be done in order to reverse the judgment.

For the reasons herein stated, it is therefore affirmed.

OTT, Judge (dissenting).

Under a liberal construction of the Workmen's Compensation Law (Act No. 20 of 1914, as amended), I think the facts in this case justify an award to plaintiff of compensation. My reasons for reaching a different conclusion from that of my associates are as follows:

The defendant Fleming, a stevedore operating under the Shipside Warehouse Company, had a contract to load the ship Queen City, which arrived in the port at Lake Charles on Sunday June 30, 1935. The ship was to be loaded with scrap iron consigned to a Japanese firm. Fleming had contracted with the Louisiana Longshoremen's Association (hereafter referred to as the L. L. A.) to furnish the labor for loading the ship. At the time there was another organization of longshoremen operating at the Lake Charles port known as the International Longshoremen's Association (hereafter referred to as the I. L. A.).

It appears that there was some rivalry between these two organizations as the I. L. A. had called a strike or lockout effective July 1, and the L. L. A. was an independent organization, willing to continue work in the face of the strike order. The inference to be drawn from the record is that the L. L. A. was favored by the

stevedores who were anxious to continue work at the port. In any event, Fleming had contracted with the L. L. A. to load the ship, and it is manifest that Fleming was familiar with the situation at the port on account of the strike order issued by the I. L. A.

It was understood that the stevedore desiring work done by the longshoremen would give notice at least two hours before the work was to begin to the business agent of the organization. Abe Knight was the business agent of the L. L. A., and on Saturday, June 29, Fleming advised Knight that this vessel would shortly arrive and to notify the men in order to have them ready. The ship did not arrive until Sunday noon the following day. In the meantime, however, Knight had called a general meeting of the L. L. A. for Sunday morning at 10 o'clock. At that time most of the members, including plaintiff, met in order to get their instructions. In view of the fact that the rival organization had called a strike or lockout for July 1, and in order for the members of the L. L. A. to be on the docks ready to begin loading the vessel before the I. L. A. began picketing, it was decided to have all members of the L. L. A. on the docks at 6 o'clock Sunday evening June 30th, and stand by for work orders. About 281 members, including plaintiff, reported at the docks Sunday evening as instructed. Most of the members understood that they would not be ordered to work until the following morning, July 1st, between 7 and 8 o'clock.

The men were to be worked in three-hour shifts and the practice was to divide them into gangs with a foreman for each gang. From 12 to 18 would have been used in each gang on this ship, with about two gangs, or a total of 25 or 30 men working during each of the three-hour shifts. This arrangement was familiar to Fleming and he consented to it, if he did not suggest it. The reason for this division of the men into three-hour shifts was in order to divide the work and to keep fresh men on the job at all times. Plaintiff was shot about 5:45 o'clock Monday morning, about an hour and a quarter before work was to begin, if it was to begin at 7 o'clock, or about two and a quarter hours before work was to begin, if it was to begin at 8 o'clock. It is admitted that plaintiff is totally disabled because of the injury, at least up to the time of the trial.

The principal question raised by the defense is whether or not plaintiff was injured while engaged as an employee of Fleming in loading, or in preparing to load, the ship under the contract with the organization to which plaintiff belonged. Under this contract between Fleming and the L. L. A., there can be no question but that Fleming invested the business agent of the organization with the power to select the employees from the members of this organization who, when they were selected and had entered upon their employment, were just as much the employees of Fleming as though he has employed them himself. Section 6 of Act No. 20 of 1914, as amended by Act No. 85 of 1926. The business agent was given the implied authority to hire men for Fleming in loading this ship, as the arrangement between Fleming and the L. L. A. contemplated that only members of this organization would be employed, and the business agent was the person by whom the men were selected.

There is considerable dispute as to whether or not Fleming suggested that all the members of the L. L. A. be at the docks Sunday evening. Knight testifies that Fleming suggested that he bring all the men out Sunday evening; Fleming denies this. However, I am satisfied that the men were out on the docks Sunday evening with the consent and approval of Fleming, if not at his suggestion. Fleming gave orders to Knight on Saturday to have the men ready for work when the ship came in. Knight says that on Sunday afternoon about 3 o'clock Mr. Horace Austin told him to have the men out at the docks at 7 o'clock Sunday evening and stand by for orders. Now I am satisfied that Austin was looking after the interest of Fleming and directing the work for him. Knight testified that he was directed by Austin Sunday afternoon over the telephone to bring the men down and carry them to shed No. 5. Knight further testified that both Fleming and Austin told him that the docks would be picketed by the I. L. A. on July 1st; that he (Knight) should bring his men out Sunday evening; that there would be guards to protect them.

The district attorney, Mr. Robira, and the sheriff, Mr. Reid, went to Fleming's home about 4 o'clock Monday morning, July 1st, to ask Fleming to get the men

out of the docks as they feared trouble. Fleming agreed to meet them at the docks in a few minutes, but wanted to see some one else before doing anything. Mr. Robira says that the person Fleming wanted to see was Austin. Why did Fleming want to see Austin, if Austin did not have anything to do with the matter?

Both Mr. Robira and the sheriff considered that Fleming and Austin were the ones to consult in getting the men off the docks. Moreover, when Fleming reached the docks that morning between 4 and 5 o'clock, just before plaintiff was shot, he went directly to the office of Austin on the docks, and after talking to Austin for a few minutes, called in the district attorney and the sheriff, and in the conversation that followed Austin did the talking for Fleming when it was agreed that work would not begin until noon Monday. Robira and the sheriff told the leaders of the I. L. A. what had been agreed to by the other side, but the I. L. A. wanted the L. L. A. to leave the docks. The district attorney and the sheriff came back to convey this proposition to Fleming, but Fleming had left, and they spoke to Austin with whom they had first talked in the presence of Fleming. Austin refused to have his men leave the docks, saying, according to the district attorney: "We are ready for them—Let them come."

The sheriff says in his testimony that Mr. Mayo represented the I. L. A. and Mr. Fleming represented the L. L. A. at the meeting early Monday morning. In other words, we have the statement of the sheriff that Fleming was not only the person that he dealt with as having authority to postpone work on the ship, but also as the person who represented the members of the L. L. A. who had come out and were ready to begin work at 7 or 8 o'clock Monday morning. The sheriff says that Fleming and Austin both agreed to wait until 12 o'clock before beginning work; that both of these men spoke with equal authority in the matter. When the sheriff and the district attorney had come back to Austin's office after getting the proposition from the I. L. A. to remove the L. L. A. from the docks, Fleming was gone, but Austin, evidently speaking for Fleming as he had done before, said: "We have the position and the defenses and to Hell with them; we are going to hold what we have got."

It is interesting and important to know why Austin was down at the docks that morning and whom he was representing. He says that he was there to look after the interests of the Lake Charles stevedores who had some property and an office on the docks. But why was he so much interested in keeping the members of the L. L. A. on the docks and why was he so active in speaking and acting for Fleming? Why did he assume so much authority to speak for Fleming, if he had nothing to do with his affairs? Why did Fleming go to Austin before discussing anything with the district attorney and the sheriff about removing the men? What made these two officers who had no interest in the matter other than to preserve peace consult Austin as well as Fleming? Austin was not a member of the L. L. A., nor did he claim to be representing the L. L. A. except in his anxiety in seeing that the men were kept on the docks to hold the advantage which they had over the members of the striking union.

The only conclusion to be drawn from the facts is that Austin was there advising with and for the interests of Fleming just as Knight had said that he was and just as the district attorney and the sheriff thought he was. Austin denies that he had told Knight to have the men down at the docks Sunday night. He also denies that he told the district attorney and the sheriff that he was not going to remove his men (the L. L. A.) from the docks. But I prefer to believe the testimony of these two officers rather than that of Austin on this point.

Knight testified that Fleming had told him that there would be guards to protect the men and suggested that none of the men bring guns. Fleming denies making such a statement. It is significant and important to note, however, that a witness, Mr. Thibodeaux, one of the men called out, testified that Fleming was out on the docks about five or ten minutes before plaintiff was shot, and Fleming came out where witness was and called for the guards; that there were three guards there and Fleming told the men to hold the lines and not let anybody come in. Another witness, Hewitt, testified that Fleming told him just a few minutes before the shooting to stand by and wait for orders to go to work. Fleming did not tell the men to go home.

In the light of this evidence and the circumstances and conditions existing at the time, I am satisfied that these men, including plaintiff, were out on the docks early

Monday morning with the consent and approval of Fleming; that they were there in order to begin loading the vessel at 7 or 8 o'clock that morning in accordance with the contract between Fleming and the L. L. A. Furthermore, I am also satisfied that the full membership was out to meet the emergency and to keep the shifts going in the face of the strike order of the I. L. A.

In any event, plaintiff and the other men were there ready to begin work. They were allowed under the contract two hours free time before beginning work. If the men were to begin work at 7 o'clock, plaintiff was injured within this two-hour period; if they were to begin work at 8 o'clock, under the circumstances, it was not an unreasonable time for plaintiff to be on the docks ready for work when he was injured just before 6 o'clock. It was necessary for him and the other men to be there before the I. L. A. blocked the entrance with pickets.

It is true that plaintiff was not paid any wages nor had he actually begun work. But it is not necessary in order for an employee to recover compensation that he actually be at work when injured, or that the injury occur during the work period. If the circumstances are such that the employee is on or about the premises where the work is to begin and is ready to begin work, and if he is under the control of the employer or his agents and the injury occurs within a reasonable time before actual work is begun, and while the employee is doing something in the interest of the employer by reason of which the employee is subjected to greater hazards than the general public, the injury is compensable.

In this case, plaintiff was on the premises ready for work under an employment made with defendant through the organization to which plaintiff belonged, and plaintiff was there with the implied, if not the express, consent and approval of the defendant to carry out the employment. The fact that plaintiff had not actually been selected for one of the gangs is immaterial. The gangs were being made up for work and under the arrangements between defendant and the L. L. A. plaintiff was ready to be called on one of the three-hour shifts. His wages were already fixed in the contract, and the hours and the class of work to be done were agreed upon, through the organization to which plaintiff belonged and the defendant.

The exigencies of the situation required plaintiff and the other men to be on the premises before the picketing of the other organization began. Plaintiff was subjected to unusual hazards because of the situation, and as he was shot while on the premises and by reason of his exposure to extra hazards, not common to the public at large, in attempting to serve the employer, he is entitled to compensation. Ivory v. Philpot Const. Company (La.App.) 145 So. 784; Malky v. Kiskiminetas Valley Coal Company, 278 Pa. 552, 123 A. 505, 31 A.L.R. 1082.

I therefore respectfully dissent.