PONDER, Justice.
 

 This is a suit by plaintiff for injuries to his minor son against Herman Fleming, conducting a stevedore business under the trade-name of Shipside Warehouse Company, David Joseph Co., Inc., and the United States Fidelity & Guaranty Company for compensation for a period not to exceed 400 weeks for total permanent disability, at the weekly rate of $20 and $250 for medical services. The case was tried in the district court and judgment was rendered therein rejecting plaintiff’s demands, which judgment was affirmed by the Court of Appeal for the First Circuit. The plaintiff applied for a rehearing, which was refused by the Court of Appeal, and the plaintiff in due course applied to this court for a writ of certiorari and review, which was granted.
 

 In the district court and the Court of Appeal there seemed to have been no serious contention that the defendant, David J. Joseph Co., Inc., was liable herein. There seems to be no serious contention to this court as to any liability on the part o'f¡ David J. Joseph Co., Inc.
 

 The contention presented. to this court seems to be solely as to whether the relation of employer and employee existed between the defendants, Fleming and the Surety Company, on the one hand and the plaintiff’s minor son on the other hand. The Court of Appeal in its decision stated, “Whether the relation had come into existence is, in our opinion, the only issue of law involved in the case.”
 

 The defendant, Fleming, entered into a contract with David J. Joseph Company to load a cargo of scrap iron aboard a ship named “Queen City.” The scrap iron had been sold to a Japanese concern. The defendant, Fleming, contracted with the Louisiana Longshoremen’s Association (hereafter referred to as the L. L. A.) on the afternoon of Saturday June 29, 1935, to use the men of that association for the labor to load the ship. The ship was expected that day but the hour of its arrival was uncertain. There were two
 
 *55
 
 longshoremen’s associations in Lake Charles at that time, the L. L. A. and the In-ternation Longshoremen’s Association (hereafter referred to as the I. L. A.). These two associations had been working together under a working agreement between the associations, but recently there had come some misunderstanding and the I. L. A. had called a strike for July 1, 1935, two days after the expected arrival of the ship, the agent of the association called a meeting of its whole membership for Sunday morning at 10 o’clock, at which time the ship had not yet arrived. It was-decided at the meeting that all the members of the association were to report on the docks at 7 o’clock Sunday evening. During Sunday night the I. L. A. called on the sheriff of Calcasieu parish and informed hijn that they had a contract to load the ship, with the view to protect their rights claimed under their contract. ' The sheriff and the district attorney went to see Fleming with the view of trying to avert trouble between the two associations. Fleming agreed to meet them on the docks and a conference was held between the sheriff, the district attorney, the defendant, ' Fleming, a Mr. Austin, and a Mr. Nelson. The sheriff informed the defendant and the other members of the conference that the I. L. A. claimed to have a contract to load the ship, which contract the I. L. A. claimed they could produce before noon of that day, and the sheriff suggested that the L. L. A. should hold up the work until that hour in order to adjust the dispute. It was agreed at this conference that this would be done and the sheriff and district attorney went to notify the members of the I. L. A., who were near the docks, of. the agreement and requested them to leave. The I. L. A. were afraid that as soon as they left the L. L. A. would proceed to load the ship and stated that they had no faith in the promises of the L. L. A., but did agree to wait until noon if the L. L. A. would withdraw their men from the docks. The sheriff and district attorney returned to the office on the docks where they had had the first conference with Fleming, Austin, and Nelson, at which time Fleming had left but Austin refused to withdraw the men from the docks stating, “We have the position and the defenses and to hell, with them; we are going to hold what we have got.” The sheriff and district attorney left, and it was but a short time thereafter that the firing began and plaintiff’s son received a shot in his right le*g causing the injury sued for herein.
 

 The point pertinent in this case is whether the relation of employee and employer on the part of the plaintiff’s son and on the part of the defendant existed at the time the injury was sustained. The evidence is conflicting as to who issued the instructions to have the members of the L. L. A. to stay in possession of the docks during the night in order to be able to load the ship the next morning. The evidence shows that all parties were aware of this fact.
 

 The sheriff testified as follows:
 

 “Q. Did you have occasion to talk with Mr. Fleming, Mr. Reid, on that morning regarding the situation at the docks? A. I went to Mr. Fleming’s house in Bagdad, and woke him up, and—
 

 
 *57
 
 “Q. Will you tell us what followed? A. You want to know what I wanted with him?
 

 “Q. Yes. A. I told him about the argument down there, about the loading of this ship, and that I as Sheriff of the Parish wanted to ask him to extend the time of loading the boat from seven A. M. until twelve P. M. — Twelve o’clock at noon; that both sides contended that they had a right to unload the boat, and that Mr. Mayo stated that they would delay matters until twelve o’clock, when he was positive he would show them he had the right to unload the boat — The I. L. A.’s had a right. Mr. Fleming represented the L. L. A. Mr. Fleming got up and agreed to meet us at 5 o’clock. About ten minutes after five, he passes us and told us to go on, and that we would meet in the office of Horace Austin, a few minutes after that. So we met there and Mr. Fleming and Mr. Austin agreed to wait until twelve o’clock. We went back on Sallier Street and met the I. L. A.’s, and told them what they had agreed to do.
 

 “Q. At this conference was Mr. Fleming present with Mr. Austin? A. Yes, the first time.
 

 “Q. What position did Mr. Austin take in the argument and discussion? A. Well, I will have to again tell you, that when we first talked to them, Mr. Austin and Mr. Fleming were there. When we went back they both agreed to this extension of time. But when I got back there there wasn’t but one there, and that was Mr. Horace Austin.
 

 “Q.
 
 Mr.'Reid, when Mr. Austin and Mr. Fleming and yourself and Mr. Robira were together on the first meeting, did Horace Austin speak with authority concerning the handling of the affairs ?
 

 “Q. On the occasion of this first meeting, who spoke as the mán in authority?
 

 “Q. I want to know, Mr. Reid, who spoke as the one in authority? A. They both spoke about the same on the subject.
 

 “Q. They both spoke about the same on the subject? A. Yes.
 

 “Q.
 
 Did Mr. Fleming object to any statements or instructions or agreements given or put out by Mr. Horace Austin, at that time? A. It was an issue to put it off. They both agreed to it, at the time.
 

 “Q. Mr. Reid, did you go back to Mr. Horace Austin’s office after talking with the International Longshoremen Association? A. Yes, sir.
 

 “Q. What transpired on the second visit to Mr. Austin’s office, Mr. Reid?
 

 “Q. Just proceed with your statement, Mr. Reid. A. I informed Mr. Horace Austin that the I. L. A. said they were perfectly willing to stay on Sallier Street if they would move their men off of the docks on the river front. Mr. Austin stated We have the position and the defenses and to Hell with them; we are going to hold what we have got.’ ”
 

 The district attorney testified as follows:
 

 “A. I called on Mr. Fleming with Sheriff Reid shortly afterwards, somewhere around four o’clock. We told Mr. Fleming of the trouble that seemed to be brewing, and in order to avoid blood shed and trouble that we would like for him to meet with us
 
 *59
 
 and see if the matter could not be adjusted, understanding that there was a supposed contract signed in favor of the I. L. A., and if that was true there could be an adjustment of the differences, but to produce that would require several hours. Mr. Fleming agreed to get up and come down to the docks. We left and were to meet him at the head of the bridge in a short while. He stated to us that he had to speak to someone else before he could do anything. He left and went away and sent for us shortly afterwards, over in what I was afterwards told was the Stevedores office, on the docks. Mr. Fleming was there. If I mistake not, old man Austin was there. Young Mr. Austin — 1 think it was,Horace Austin, but I couldn’t be sure. Mr. Austin Nelson was also present, and Mr. Henry Reid, the Sheriff. We told them of the fact that the I. L. A. claimed they had a contract, and that could be produced before noon, if there was a suspension of the work on the docks, and it would prevent possible blood shed. There were two warring factions, one on the docks and one on the outside. They all agreed to suspend all operations, and agreed there would be no men working on the boat until twelve o’clock, to give both sides a chance to adjust their differences. When we returned we met some of the leaders of the I. L. A. on Sallier Street, and reported to them that they could go back home, that everything had been adjusted. They stated that they didn’t like breaking up at that time, because they said they would not keep faith; that as soon as they left they would begin loading the ships. Mr. Austin stated flatly that he would not take his men off, saying We are ready for them — Let them come.’ I told Mr. Austin that his attitude was unbecoming and that it would probably lead to. bloodshed. I think Mr. Fleming left before we came back.
 

 “Q. Did Mr. Fleming hear the conversation? A. Yes, he was right there with us. Mr. Austin Nelson, Mr. Henry Reid and myself.
 

 “Q. Mr. Robira, tell what happened on the second occasion when you went to Mr. Austin, and told him that it was necessary for the L. L. A. to go home? A. Mr. Fleming wouldn’t discuss the matter with us until he had seen some one else, and that other party was Mr. Austin, because he was the man we were led to, and he was the man that spoke to us. And when we returned and told him the men would have to be withdrawn, one crowd taking Sallier Street and the other crowd taking the river front, in an effort to avoid clashing, Mr. Austin said: ‘Let them come. We are ready for them.’ I think we told him the blood would be on his hands and not ours. He refused to do anything further and we went off, and immediately proceeded to communicate with the Governor to try to get the Militia, because the atmosphere was so charged with trouble that we saw it was necessary to get relief. When the Sheriff got in his office to ’phone the Governor, we heard the rapid firing of' the guns which ‘ sounded like war. The Sheriff said there was no use calling — they must all be dead.”
 

 It is undisputed that the plaintiff's son, Leño Ledoux, was ordered to the
 
 *61
 
 docks to go to work by the L. L. A. and that he was there in furtherance of said order. Fleming invested the business agent of the L. L. A. with the power to select the employees to load the ship. Having done so, the employees were just as much the employees of the defendant, Fleming, as though he had directly employed them himself.
 

 The Court of Appeal in its majority opinion and in the dissenting opinion of one of its members discusses the testimony at length. It is unnecessary for us to go into a detailed discussion of the testimony in this case as to who instructed the men to stay on the docks that night, since, prior to the shooting, the conference of the sheriff and district attorney with the defendant, Fleming, shows conclusively that the defendant, Fleming, was in control of the movements of the L. L. A. at that time. There can be no question but that Austin was acting for the defendant from the testimony of the sheriff and district attorney. It is to be seen from that testimony that Austin was the man that Fleming had to see before they had the conference. Fleming fixed the place where the conference was to be had with the sheriff and district attorney. Why would the sheriff go back to see Austin instead of looking up Fleming at the second meeting if Austin did not have authority to act? All this transpired before the plaintiff’s son was injured. Therefore at the time the injury was received the plaintiff’s son was under the direction of the defendant, Fleming, and his agent, Austin, and the relationship of employer and employee existed at that time.
 

 In this case the plaintiff’s son was subjected to an unusual hazard while he was under the control and subject to the direction of the defendant and his agent, Austin. He would not have been subjected to this unusual hazard had he not been so employed. He was acting in the interest of the employer’s business and under the doctrine laid down in the case of Ivory v. Philpot Construction Co. (La.App.) 145 So. 784, the defendant is liable.
 

 The plaintiff in this case is entitled to relief for the injury of his minor son who was injured while in the employment of the defendant, Fleming, and also for relief against defendant’s insurer, United States Fidelity Company.
 

 The contract of employment was not introduced in the evidence in this case. The testimony shows that the plaintiff’s son was to receive 85 cents for straight time and $1.30 for overtime. Computing eight hours per day at 85 cents per hour for six days per week and allowing 65 per cent, of that amount for a weekly amount would exceed $20 per week. Therefore the plaintiff is entitled to recover at the rate of $20 per week. The plaintiff’s son was injured July 1, 1935, and was unable to do work of any nature up to and including the day the testimony was taken in the case which was May 7, 1936. If the plaintiff’s son was permanently injured the plaintiff would be entitled to recover at the rate of $20 per week for 400 weeks. This computation is made in accordance with the doctrine laid down in
 
 *63
 
 the case of Rylander v. Smith & Son, 177 La. 716, 149 So. 434. There is evidence in the record to the effect that they had intended to work the men on shifts of less time than eight hours per day but it has an element of uncertainty. However, we do not think it should control were it certain for the reason that plaintiff’s son had been on duty all night when he was injured. There could be a reasonable contention that night work should be computed as overtime. But we believe the reasonable computation should be based on an eight-hour day. We cannot from the testimony with any degree of certainty determine whether or not the injury was' permanent. However, from the evidence we know that the injury prevented plaintiff’s son from doing any work of any character up to the date of the trial of this suit and that we should render judgment up to that date reserving to plaintiff the right to sue for any amount that may be due as long as the injury prevails, not to exceed 400 weeks in all.
 

 For the reasons assigned, the judgment of the lower court and the judgment of the Court of Appeal for the First Circuit is reversed, and there is now judgment in favor of the plaintiff condemning the defendants, Herman Fleming and the United States Fidelity Company to pay to the plaintiff for the use and benefit of his minor son, Leño Ledoux, $20 per week from July 1, 1935, to May- 7, 1936, with legal interest on all past-due weekly payments and $250 for medical expenses. Plaintiff’s right to sue for any compénsation that his son may be entitled to after May 7, 1936, is specially reserved. Defendant to pay all costs of this suit.